**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| ROBERT YOST and | )    Criminal No. 21-467 |
| JACOB REESE, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**<u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>**

      This Court held a bench trial on October 24 and 25, 2022, as to the three-count Information against Defendants Robert Yost ("Yost") and Jacob Reese ("Reese"), charging them with: (1) conspiracy to commit offenses against the United States—(a) 7 U.S.C. §§ 136j(a)(2)(F), 136l(b)(2), and (b) 16 U.S.C. § 703(a)—all in violation of 18 U.S.C. § 371; (2) unlawful distribution, making available for use, and use of a registered restricted-use pesticide in violation of 7 U.S.C. §§ 136j(a)(2)(F), 136l(b)(2), and 18 U.S.C. § 2; and (3) unlawful killing and attempt to kill migratory birds—seventeen Canada geese, ten red-winged blackbirds, and one mallard duck—without authorization, in violation of 16 U.S.C.§§ 703(a), 707(a), and 18 U.S.C. § 2. (Docket No. 1).  For the reasons set forth herein, the Court finds the Defendants guilty as to Counts One, Two, and Three.

**I.    <u>Procedural History</u>**

      In this case, the Government filed the Information against Yost and Reese on November 8, 2021, for charges stemming from their alleged killing of twenty-eight migratory birds on leased farmland in June 2020.  The Government therein alleged that Yost and Reese conspired to (a) violate the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), and the (b) Migratory

1

Bird Treaty Act (MBTA).    (Docket No. 1, Count One).    Next, the Government alleged that Yost and Reese aided and abetted one another in violating FIFRA by knowingly distributing, making available for use, and using a registered restricted-use pesticide (carbofuran) for the purpose of killing migratory birds.    (Docket No. 1, Count Two).    Finally, the Government alleged that Yost and Reese aided and abetted one another in violating the MBTA by unlawfully killing and attempting to kill migratory birds without permit or authorization.    (Docket No. 1, Count Three).

Yost and Reese pleaded not guilty to all three counts, and a bench trial was scheduled to begin on October 24, 2022.    (Docket Nos. 14, 24, 57).    Prior to the trial, the parties submitted a number of Joint Stipulations.    (Docket No. 69).    The bench trial was held over two days from October 24th to October 25th, 2022, and the official transcript of the trial was filed at Docket Nos. 78 and 79).[1]    After the trial, the parties submitted proposed findings of fact and conclusions of law.    (Docket Nos. 82, 83, 84-85).    The Government filed responses to Yost's and Reese's proposed findings and conclusions.    (Docket Nos. 86, 87).    The Court's findings and conclusions are set forth herein.

## II.      Stipulations and Evidence Presented at Bench Trial

At trial, the Government presented the testimony of five witnesses: (1) Theresa Edwards; (2) Benjamin Edwards; (3) State Game Warden and Wildlife Conservation Officer Byron Gibbs ("Officer Gibbs"); (4) Janet Driggers, former agronomic products inspector with the Pennsylvania Department of Agriculture ("Ms. Driggers"); and (5) Karen Worrell.    The parties' joint stipulations, relevant testimony of witnesses, and documentary evidence received at trial consisted essentially of what follows.

---

[1]        Citations to the transcript are to Docket No. 78 unless otherwise specified.

Yost is the operator of Yost Farms in New Galilee, Pennsylvania. (Docket No. 69, pg. 1). Reese is an employee of Yost and Yost Farms. (*Id.*).[2] Yost Farms had a longstanding relationship with nearby Edwards Farm, which had been in the Edwards family since 1911. (Docket No. 79, Tr. 41:1). Yost Farms regularly leased property from the Edwards Farm for its own farm operations. (Docket No. 69, pg. 1). One of the fields leased by Yost Farms was a 1.5-acre field that sits between Wampum New Galilee Road and the border of wetlands. (Tr. 27:18-24; Exhibit ("Ex.") 1). Another was a slightly larger field—eight to ten acres—and sits nearby on a hill between Wampum New Galilee Road and I-376. (Tr. 28:1-12; Ex. 1). From 2003 to the end of 2018, Keith Edwards managed the Edwards Farm and, accordingly, the informal leasing arrangement between it and Yost. (Tr. 130:1-2; Docket No. 79, Tr. 41:4-19).

In February 2019, when Keith Edwards's health deteriorated, his sister—Karen Worrell—took over management of the farm. (*Id.*). Not long thereafter (June 2019), Keith Edwards's son and daughter-in-law (Benjamin and Theresa Edwards (collectively, "the Edwardses")) moved into a home at the Edwards Farm that overlooks the aforementioned fields. (Tr. 23:5-7, 29:9-16). Theresa Edwards testified that she frequently observed Yost Farms' farming activities through a large window overlooking those fields. (Tr. 29:9-16).

The relationship between members of the Edwards family and Yost was amicable for many years. (Tr. 30:6-10). But then, in June 2020, Theresa Edwards observed that one of Yost's employees—Sean Clark—"shot off a gun out of his pickup that was sitting on Wampum New Galilee Road into the … small field, the one and a half acre field." (Tr. 33: 3-9). She testified

---

[2]     Yost is a certified private applicator of pesticides (Docket No. 69 at 3), but Reese has never been a certified private applicator of pesticides in the Commonwealth of Pennsylvania. (*Id.*).

that he shot "towards the wetlands."   (Tr. 34:1).   This was unusual because it was not hunting season, and she "saw a bunch of geese go flying after the gunshots."   (Tr. 33:14-17).   Theresa Edwards took photographs of the Yost Farms employee and the truck he was driving to document the incident.   (Tr. 34: 6-7, 18-20; Ex. 5).   Theresa Edwards further testified that in June 2020 there was a "second incident of Sean Clark … shooting from a pickup from the road into our small field."   (Tr. 34:4-5).[3]

Benjamin Edwards similarly testified that he was woken up by gunshots one morning in June.   (Tr. 133:6-8).   He indicated that he was *not* surprised by the shooting (though his family may have been) because he "knew the geese were eating soybeans" and it was "only a matter of time" before there would be activity to try to "scare the geese out of the fields."   (Tr. 133:9-19). Theresa Edwards testified that she called the Pennsylvania Game Commission concerning this incident out of concern for safety of her young children, father-in-law, and her husband's uncle. (Tr. 37:20-38:11).   When Officer Gibbs testified, he indicated that he was aware of the Edwardses' complaint about gunshots, and that he had closed out the incident report because no birds were recovered that had been shot.   (Tr. 177:7-11).   Like Theresa Edwards, Karen Worrell was concerned about the gunshots, but she "knew that geese were destroying some of the crops in the fields that [Yost] had planted," and she acknowledged that "it wasn't illegal for the geese to be harassed."   (Docket No. 79, 42:20-43:7).

Within the next week, Theresa Edwards saw another of Yost's employees, Reese, on a Gator Utility Task Vehicle ("UTV") in the tall grass of the wetlands near the larger of the two

---

[3]     Theresa Edwards testified that she took pictures of the first of two instances when Sean Clark shot into the "small field."   (Tr. 34:4-5, 35:5-7).   She testified that the shooting incidents were "a few days" apart.   (Tr. 39:5).

aforementioned fields, and she asked her husband to look into it when he was home.   (Tr. 38:16-22).   Her husband inspected the area the following day and discovered traps.   (Tr. 41:2-8). Benjamin Edwards testified that when he inspected the tall-grass area, he first saw a small flag and that he found the first trap around that flag.   (Tr. 141:4-8).   Benjamin Edwards and his wife again called the Game Commission and, when a game warden arrived, he and Benjamin Edwards found approximately eight traps.   (Tr. 142:1-4).   Benjamin Edwards testified that these were "leg hold traps."   (Tr. 141:12).   Officer Gibbs testified that he was the game warden who responded to this incident.   (Tr. 177:24-178:2).   And, like Benjamin Edwards, Officer Gibbs testified that they found foothold traps "[a]long the edge of the field closest to the water of the pond."   (Tr. 178:6-10).   Officer Gibbs testified that the traps might be set for wild migratory birds (like geese), but that he could not "definitively say what was being targeted" because the traps were not baited.   (Tr. 179:12-23).   He further noted that he saw "groundhog holes" in the area and that it was permissible to trap groundhogs for agricultural protection.   (Tr. 179:1-3).   In addition to the traps, Officer Gibbs found some blue soybean seeds that day.   (Tr. 170:16-17; 180:6-11).

After Benjamin Edwards notified Karen Worrell about the traps, Karen Worrell spoke with Yost who agreed to and ultimately did remove them.   (Tr. 41:2-13).   With respect to this agreement to remove the traps, Karen Worrell testified that she called Yost on or around June 19, 2020, and discussed her safety concerns arising from the shooting issues and the traps.   (Docket No. 79, Tr. 43:18-24).   She testified that she asked Yost to remove the traps, and made it very clear that she did not want "people or geese hurt."   (Docket No. 79, Tr. 44:1-2; 45:5-8).   As indicated above, Yost removed the traps that afternoon.   (*Id.*).

Then, on June 22, 2020—*i.e.*, the Monday following the incident with the traps—Theresa Edwards took note that Reese was back out on the larger of the two fields with a UTV, and she testified that "he had a shovel in hand, and he was spreading … something … off the shovel onto the field."   (Tr. 42:8-15).   She testified further that Reese appeared to be spreading something from a dark "sack" on the edge of the field near the wetlands.   (Tr. 45:19-23, 46:18-22).   The field (hereinafter "the soybean field") itself had been planted with soybeans that year, and it was populated with "very small soybean plants" at the time.   (Tr. 44: 18-20).   Theresa Edwards took pictures of this incident like she had of other Yost farm activities.   (Tr. 42:10-21; 43:8-22; Ex. 6).[4]

---

[4]       Whether these pictures were taken on June 22nd was questioned at trial.   While Theresa Edwards testified to having taken pictures of Reese in the soybean field on June 22nd (Tr. 106:12-19), the metadata for these pictures indicated that that were taken on Wednesday, June 17, 2020.   (Tr. 107:2-4; Ex. E, Ex. F).   Theresa Edwards somewhat confusingly explained that the metadata was incorrect and that her camera's time-stamping function was accurate as of June 15th (when she had taken pictures of Sean Clark shooting into the small field), but that she had dropped her phone on vacation, broken the mirror, or the battery had died (or a combination of the three) before she took it to Best Buy to be repaired and retrieved it before the 22nd.   (Tr. 103:18-19; 104:23-25; 105:2-3).   Yost and Reese point out that Benjamin Edwards's testimony somewhat undermines the credibility of his wife's testimony in this regard because he testified they *had not* been on vacation between June 18th and June 23, 2020.   (Tr: 157:8-24).   Yost and Reese also argue that Theresa Edwards's timeline is internally inconsistent insofar as she could not have gotten her camera back until *after* June 22nd if she had gone on vacation, returned, and taken her camera to Best Buy for repair all after June 18th.   And they suggest that it is more likely Theresa Edwards's pictures show Reese burying traps on June 17th, than that they show him spreading something in the field on June 22nd.

This Court is the finder of fact in this matter and, as such, may "accept or reject any or all of a witness's testimony."   *United States v. Murphy*, 402 F. Supp. 2d 561, 569 (W.D. Pa. 2005).   The finder of fact may "decide whether to believe a witness based on his or her behavior and manner of testifying, the explanations the witness gives, and all the other evidence in the case."   *Third Circuit Model Criminal Jury Instructions*, 1.10.   Factors relevant to the determination include "demeanor … , the witness's ability to accurately recollect the matters at hand, the manner in which the witness may be affected by the outcome, the extent to which the witness's testimony is either supported or contradicted by other evidence and testimony in the case, and, ultimately, the extent to which it withstands a common sense test of reason and logic."   *Murphy*, 402 F. Supp. 2d at 569.   Considering these factors, the Court is convinced that inconsistencies in Theresa Edwards's testimony with respect to when she took pictures of Reese in the soybean field and why the metadata of her pictures is inconsistent with her recollection do not warrant rejecting her testimony that she saw Reese in the soybean field on June 22nd.   As discussed herein, Theresa

The next day—June 23, 2020 (Tr. 184:8)—Benjamin Edwards saw something in the soybean field and asked his family to check on it.   (Tr. 49:16-18).   Benjamin Edwards explained that he was on his way to his aunt's home when he saw "a bunch of birds in the field" and it "didn't look right."   (Tr. 145:20-146:1).   Theresa Edwards sent their son to check out the soybean field, and later joined him there.   (Tr. 49:16-18).   Once she arrived, she found dead "geese, ducks, [and] red-winged birds."   (Tr. 49:20-22, 50:2-4).   She also found "[a] lot" of corn on the ground "from one corner of the field all the way down to the other corner."   (Tr. 51:8-18).   She testified that the presence of corn was confusing because soybeans were planted in that field.   (Tr. 51:22-52:4).   Theresa Edwards took several pictures on her phone of what she observed (Tr. 50:5-25; Ex. 24), and called the Game Commission.   (Tr. 55:2-4).

Officer Gibbs arrived shortly thereafter.   (Tr. 55:9-13).   Theresa Edwards and her son eventually returned to their home, stripped out of their clothes, and showered immediately, as directed by Officer Gibbs.   (Tr. 55:21-56:4).   Officer Gibbs testified that, when he arrived, he could see dead geese from the side of the road.   (Tr. 184:3-5).   Officer Gibbs then "walked along [a] trail of corn that may have been about 100 yards long" with "dead animals either on the corn or just off to the side of the corn," while making a GPS trail of his walking route.   (Tr. 184:20-24; Ex. 8).   He also took pictures.   (Tr. 186:1-9; Ex. 7).   In total he found seventeen geese,

---

Edwards's testimony that she saw Reese spreading something in the soybean field on June 22nd is consistent with Yost's and Reese's later admissions to Officer Gibbs that Reese was spreading corn in the soybean field on June 22nd.   Therefore, the Court accepts Theresa Edwards's testimony as partially credible insofar as she testified that she saw Reese spreading something in the soybean field on June 22nd. *See United States v. Givan*, 320 F.3d 452, 464 (3d Cir. 2003) (explaining that the district court did not err in relying on certain testimony at sentencing where there "was at least … minimal indicia of reliability to support the court's reliance" thereupon).

seven[5] red-winged blackbirds, and what appeared to be a female mallard duck, "all dead … on or beside where that corn was."   (Tr. 185:3-5).   Officer Gibbs noted that "the corn was right in the middle of all the dead birds."   (Tr. 185:16-19).   He looked for other possible causes of death like "a gunshot, for example," but did not find anything.   (Tr. 187:15-22).   Based on his observation of the corn in the middle of the birds and his experience, Officer Gibbs suspected that the corn had been poisoned.   (Tr. 187:23-188:1).

Before leaving the field, Officer Gibbs collected some of the corn, but not all of it because there was "far too much of it."   (Tr. 191:2-4, 197:13-14).   Officer Gibbs then left to attend an unrelated court hearing at 2:15PM, and returned later that day (around 4:00PM) with a search warrant for Yost Farms.   (Tr. 197:17-22, 198:7-11).   When he returned, Officer Gibbs collected bird carcasses for testing.   (Tr. 197:23-24).[6]   The Pennsylvania Animal Diagnostic Laboratory System (PADLS) tested the Canada goose carcasses and corn that Officer Gibbs retrieved from the soybean field.   (Docket No. 69, pg. 4).   The parties jointly stipulated to the PADLS's conclusion that the three Canada geese submitted for testing had died of carbofuran toxicity and that the corn testing showed the presence of carbofuran.   (*Id.*).

When Officer Gibbs returned to Yost Farms later in the day on June 23rd, he hoped to find the "kind of poison that would be used to kill all these geese," *i.e.*, what had been applied to the corn.   (Tr. 200:6-9).   When he went to Yost Farms to execute his search warrant, he wore his body camera, as was his normal practice.   (Tr. 201:5-8).   Officer Gibbs's body-camera footage

---

[5]   Officer Gibbs found three additional red-winged blackbirds when he returned to the site the next day.   (Tr. 190:23-25).

[6]   Officer Gibbs collected all the dead birds to prevent secondary poisoning, but only three were selected for toxicology testing.   (Tr. 195:20-197:11).

from June 23, 2020 (Ex. 9) was admitted without objection at trial.   (Tr. 202:6-18).   A transcript of the body-camera footage (with redactions) was also admitted.   (Tr. 203:3-13; Ex. 10). Concerning the interaction documented on his body-camera, Officer Gibbs indicated that when Yost was told about the dead birds in the field, he "didn't seem surprised."   (Tr. 204:2-5). Rather, when he told Yost that dead birds had been found where Reese had been observed shoveling corn into the soybean field, Yost replied: "we have just been … putting corn down … you know … seed corn, so they quit eating all the soybean damaged."   (Ex. 10, pg. 2; Tr. 204:11-205:3).   When Officer Gibbs indicated that he did not believe Yost, Yost replied that the corn that had been spread was "treated corn," insofar as it was treated with "a whole concoction" of "fungicides and all kinds of things."   (Ex. 10, pg. 3, 21 ("I guess maybe in hindsight we should have just used regular corn, out of the bin that probably wouldn't hurt a thing.")).   However, Yost denied that the corn was poisoned.   (*Id.*).   He speculated that perhaps the birds had "gorged themselves" and that eating enough of the seed corn could be fatal.   (Ex. 10, pgs. 3-4; Tr. 205:20-206:10).

The body-camera footage shows, and Officer Gibbs testified, that Reese was also present when Officer Gibbs executed the warrant.   (Ex. 10, pg. 8; Tr. 210).   Officer Gibbs spoke to Reese, and he asked him about "the corn that you broadcast out yesterday in that field" and asked Reese to "take me to [that corn]."   (Ex. 10, pg. 8).   Reese responded that the corn in question was "our old seed."   (*Id.*).   Yost confirmed that he told Reese to distribute corn to feed the geese thus.   (Ex. 10, pg. 20 ("I told him to put this out there.   I mean, he works here, I'm his boss"); Tr. 210: 11-12).   And when Officer Gibbs asked Reese about "shoveling out something from the back of the UTV," Reese did not deny it.   (Tr. 210:17-24).

9

Officer Gibbs asked whether Reese could "show [him] the actual bag that was on the back of the [UTV] that [Reese] was shoveling out of yesterday," and Reese responded that he could not because he had used up the bag and the bag itself had been "Burned."   (Ex. 10, pg. 9).   Yost indicated it was usual practice to burn paper bags, and Reese indicated that they had "burnt all the garbage yesterday."   (Ex. 10, pg. 26).   At that point, Yost and Reese directed Officer Gibbs to unopened bags of "seed corn," which is what they said Reese had spread in the soybean field. (Tr. 211:5-12).   They offered to give Officer Gibbs a sample of the seed corn but, when Officer Gibbs looked at it, he noted that its appearance was obviously different than the yellow corn in the soybean field.   (Ex. 10, pg. 33).   Whereas the corn strewn about the soybean field was "normal yellow corn" (*id.*), the corn that Yost and Reese showed Officer Gibbs "had … antifungal … coating on it" that was either "reddish-pink" or green.   (Tr. 211: 21-212:2; 248:12-14).   Officer Gibbs ultimately concluded his search of Yost Farms without finding carbofuran.   (Tr. 249:18).

Yost tried to call Karen Worrell later that evening, but the two were not able to connect until the following morning (June 24th).   (Docket No. 79, Tr. 46:10-12).   Karen Worrell conveyed her dismay over the dead geese, and told Yost that while he would be permitted to spray and harvest his crop on their property, she did not want anyone else on the Edwards Farm otherwise.   (Docket No. 79, Tr. 47:17-23).

Ms. Driggers at the Pennsylvania Department of Agriculture was notified of the need for an investigation in this matter on August 3, 2020.   (Docket No. 79, Tr. 6:20).   As part of her investigation, Ms. Driggers interviewed Officer Gibbs, Yost, Reese, and Theresa Edwards. (Docket No. 78, Tr. 7:11-23, 34:8).   Ms. Driggers testified that Yost explained he was the only person to handle pesticides on the farm, and he denied that he was aware of any corn or dead geese

in the soybean field until Officer Gibbs arrived at Yost Farms with a search warrant.   (Docket No. 78, Tr. 10:25-11:4; 25:9-12; 38:24-39:3).   Yost was present during Ms. Driggers's interview of Reese, and Reese also stated during the course of the interview that "he was unaware of any corn or dead geese in that field until the Game Commission arrived."   (Docket No. 79, Tr. 13:10-12, 16-21).   Ms. Driggers noted that she had reviewed Officer Gibbs's June 23, 2020, body-camera footage and that she perceived that Yost and Reese's interviews were not consistent with what they had told Officer Gibbs.   (Docket No. 79, Tr. 14:20-22, 15:7-12).   For example, whereas Yost told Officer Gibbs that he had Reese "put corn in that field to feed the geese to keep them away from his plants," Yost told her "he wasn't aware of any corn being in that field" until Officer Gibbs arrived.   (Docket No. 79, Tr. 15:14-21).[7]

## III.   Findings of Fact and Conclusions of Law

In this bench trial, the Court "must find the defendant guilty or not guilty."   Fed. R. Crim. P. 23(c).   Except where the Court makes specific findings to the contrary below, the Court adopts as its factual findings the summary of evidence set forth *supra*, Section II (Stipulations and Evidence Presented at Bench Trial).   The Court has drawn certain inferences from that evidence which are set out below.   *United States v. Garner*, 915 F.3d 167, 170 (3d Cir. 2019) (explaining that inferences from evidence must "have a logical and convincing connection to the facts established" (quoting *United States v. Applewhaite*, 195 F.3d 679, 684 (3d Cir. 1999))).

---

[7]   There was some question at trial of whether Yost and Reese denied to Ms. Driggers that they were aware of "any corn or dead geese" in the soybean field before Officer Gibbs arrived with his warrant, or that they merely denied to Ms. Driggers having been aware of or having put "tainted corn" in the field. (Docket No. 79, Tr. 32:7-11; 33:1-7).   But Ms. Driggers clarified that point when she testified that Yost stated: "that he didn't tell [Reese] to put out any corn" and that "[h]e was unaware of *any* corn there." (Docket No. 79, Tr. 38:24-25 (emphasis added)).   And Reese never indicated that he had put seed corn in the soybean field in June 2020.   (Docket No. 79, Tr. 39:1-3).

For each offense charged, the Government must prove each element of the offense beyond a reasonable doubt.   *United States v. Caraballo-Rodriguez*, 726 F.3d 418, 425 (3d Cir. 2013) (en banc).   Proof beyond reasonable doubt "does not mean proof beyond all possible doubt or to a mathematical certainty."   *Third Circuit Model Criminal Jury Instructions*, 3.06.   Reasonable doubts are "based on reason, logic, common sense, or experience," and would cause "an ordinary reasonable person" to "hesitate to act in matters of importance in his or her own life," and may be due to "the evidence, or from the lack of evidence, or from the nature of the evidence."   *Id.*   Such a degree of certainty may be proven by the Government "with direct or circumstantial evidence." *Id.*; *United States v. Gibbs*, 190 F.3d 188, 197 (3d Cir. 1999) ("The government may prove these elements entirely by circumstantial evidence.").

### A.   Count One - Conspiracy to Commit Offenses Against the United States

Defendants are charged in Count One of the Information with violating 18 U.S.C. § 371 for conspiring to commit offenses against the United States.   Two objectives of the conspiracy are set forth therein: (1) to violate FIFRA, 7 U.S.C. §§ 136j(a)(2)(F), 136l(b)(2), by knowingly distributing, making available for use, and using the registered restricted-use pesticide carbofuran for the purpose of killing migratory birds, which is a purpose other than in accordance with carbofuran's classification under FIFRA; and (2) to violate the MBTA, 16 U.S.C. § 703(a), by unlawfully killing and attempting to kill migratory birds without permit or authorization. (Docket No. 1, pgs. 4-6).

### *Legal Standard*

The elements of conspiracy to commit offenses against the United States under 18 U.S.C. § 371 are: (1) that two or more persons agreed to commit an offense(s) against the United States,

as charged in the indictment or information; (2) that the defendant was a party to or member of that agreement; (3) that the defendant joined the agreement or conspiracy knowing of its objective(s) to commit an offense(s) against the United States and intending to join together with at least one other alleged conspirator to achieve that/those objective(s), *i.e.*, the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal(s) or objective(s), to commit an offense(s) against the United States; and (4) that at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement. *Third Circuit Model Criminal Jury Instructions*, 6.18.371A. Where, as here, the Government charged a conspiracy having two objects—to violate FIFRA and to violate the MBTA—a guilty verdict is appropriate if the Government proves conspiracy with respect to either object beyond a reasonable doubt. *United States v. Scarfo*, 41 F.4th 136, 194 (3d Cir. 2022).

*Findings and Conclusions*

Having considered the parties' stipulations, the evidence presented at trial, and the parties' post-trial proposed findings and conclusions, the Court has determined that the Government's evidence is sufficient to prove beyond a reasonable doubt that Yost and Reese conspired to commit offenses against the United States. Specifically, the Court has determined that the Government has proved beyond a reasonable doubt that Defendants conspired to violate FIFRA.[8]

The evidence supporting a guilty verdict for Count One is largely the same for Yost and Reese. For the first and second elements of the charged conspiracy, the evidence shows that Yost and Reese agreed that Reese would spread corn in the soybean field on June 22, 2020. When

---

[8]     The Court, therefore, will not address the allegation of conspiracy to violate the MBTA.

Officer Gibbs was executing his search warrant on June 23rd and asked Yost if he could speak

with Reese, Yost called Reese.   (Ex. 10, pg. 7).   On the call, before Reese joined Yost and

Officer Gibbs in person, Yost explained "[Officer Gibbs] wants to see this … corn down here …

the stuff in the building here that *we* put out for the geese to eat."   (*Id.* (emphasis added)).

Once Reese joined them, and confirmed he put down corn the day prior, Officer Gibbs

eventually asked: "How did all this happen?   Who … who gave the order to do it?   Who bought

this stuff; where is this stuff at?   Those are the questions I want to know."   (Ex. 10, pg. 19).

Yost ultimately responded: "I told him to put this out there, I mean, he works here.   I'm his boss."

(Ex. 10, pg. 20).   Reese's confirmation of putting down corn for the geese, Yost's confirmation

that he instructed Reese so to do, and Theresa Edwards's testimony that she saw Reese in the

soybean field (confirming that Reese followed through on Yost's instruction), together shows

agreement between Yost and Reese that satisfies the Government's burden of proof for the first

and second elements of conspiracy.   *See Third Circuit Model Criminal Jury Instructions*,

6.18.371C (explaining that "[t]he government does not have to prove the existence of a formal or

written agreement, or an express oral agreement spelling out the details of the understanding").

For the third element of the charged conspiracy—that Yost and Reese were unified in

purpose—the circumstantial evidence presented in this case permits an inference that Yost and

Reese intended to violate FIFRA, *i.e.*, intended to "distribute … or to make available for use, or to

use, [a] registered pesticide classified for restricted use for some or all purposes other than in

accordance with section 136a(d) of this title and any regulations thereunder," 7 U.S.C.

§ 136j(a)(2)(F), and did so knowingly, *id.* § 136l(b)(2).   *See United States v. Alston*, 77 F.3d 713,

718 (3d Cir. 1996) ("[T]he government must prove whatever level of *mens rea* is required for

conviction of the underlying substantive offense."); *see also United States v. McKee*, 506 F.3d 225, 241 (3d Cir. 2007) ("The government must proffer evidence that he/she knew of the agreement and intended both to join it and to accomplish its illegal objects."). Unity of purpose may be "inferred from conduct that furthered the purpose of the conspiracy." *Id.*

Officer Gibbs testified that when he arrived at the Edwards Farm on June 23, 2020, he found a large amount of whole kernel corn in the same area of the soybean field as the dead migratory birds. Officer Gibbs collected some of the corn and three Canada goose carcasses for toxicology review. PADLS's testing showed that the geese's cause of death was carbofuran toxicity and carbofuran was detected in the corn. As the parties have stipulated, carbofuran has had no authorized uses since 2009. While there is no direct evidence that Yost and Reese agreed to violate FIFRA by knowingly spreading carbofuran-treated corn in the soybean field—as opposed to, for instance, untreated corn—there is adequate circumstantial evidence from which the Court can infer Yost's and Reese's unity of purpose in violating FIFRA.

As an initial matter, the Edwardses' and Officer Gibbs's discovery of a large amount of whole kernel yellow corn—the sample of which was positive for carbofuran—one day after Theresa Edwards observed Reese shoveling a substance into the soybean field, combined with Yost and Reese's confirmation that Reese was intentionally spreading corn there on the same day, amply supports an inference that the corn discovered on June 23rd was the same corn Reese distributed on June 22nd. With respect to whether Yost and Reese knowingly spread carbofuran-treated corn, the Court considers that Yost was a certified pesticide applicator, Reese was an experienced farmworker, and that part of the farm's practices included the use of various agrichemicals. (*E.g.*, Ex. 10, pg. 23, 24 (Yost: "I have herbicides, agricultural chemicals.")).

Such evidence of familiarity is relevant to determining whether a defendant has acted knowingly or by mistake.   *See United States v. Boone*, 279 F.3d 163, 187 (3d Cir. 2002) (citing *United States v. Ferrer-Cruz*, 899 F.2d 135, 138 (1st Cir. 1990) (explaining than an individual's "previous experience with drugs" is relevant to determining whether an individual would recognize that a bag's contents were drugs)).   Given Yost's and Reese's familiarity with agrichemicals, it is reasonable to infer they would be able to differentiate between carbofuran-treated corn and other corn such as seed corn.

The Court also considers that, when confronted about the deaths of almost thirty migratory birds, Yost and Reese directed Officer Gibbs to seed corn that had obviously different physical characteristics than the corn Officer Gibbs found in the soybean field.   Yost's and Reese's misdirection in this respect is relevant to consciousness of guilt.   *Third Circuit Model Criminal Jury Instructions*, 4.31.   Not only that, but when Officer Gibbs inquired about the bag of corn Reese had used in the soybean field, Reese indicated that the bag had been burned.   Such destruction of the bag may suggest a consciousness of guilt and may be considered as evidence thereof.   *See Third Circuit Model Jury Instructions*, 4.30.   The Court has also considered the evidence of Yost Farms' escalating attempts to stop geese from destroying the soybean crop, from presumably lawful measures (like shooting to harass the geese) to setting traps near the soybean field.

Yost and Reese argue that no carbofuran was found at Yost Farms, there was no effort to test the UTV that Reese purportedly used to distribute corn in the soybean field on June 22nd, and that there was no inspection of the burn-pit where Yost Farms burned trash.   However, the Court notes that the Government is not required to present all possible evidence so long as it produces

sufficient evidence to establish guilt beyond a reasonable doubt.   *Third Circuit Model Criminal Jury Instructions*, 3.05.   Yost and Reese also argue that the Government's case relies heavily on Theresa Edwards's testimony, and that her testimony is not credible.   For instance, Yost and Reese argue that the metadata (time stamps) of photographs she purportedly took of Reese on June 22nd and her testimony about the photographs are inconsistent, as is her testimony attempting to explain why photographs she said were taken June 22nd appear to be from June 17th.   They also argue that her testimony that she saw a burlap bag in the back of the UTV driven by Reese on June 22nd is inconsistent with the appearance in pictures of a milk crate rather than a burlap bag.   Yost and Reese suggest that these contradictions are suggestive of deliberate misrepresentation. However, Theresa Edwards's testimony that Reese was in the soybean field on June 22nd is corroborated by significant other evidence in the record—most notably, Yost's and Reese's own statements to Officer Gibbs on June 23rd.[9]

With respect to the last element of conspiracy—an overt act—the Court is satisfied that Yost's admission to Officer Gibbs that he told Reese to spread the corn demonstrates an overt act to further the objective of the agreement.   Reese's follow-through in spreading corn in the soybean field also constitutes an overt act in furtherance of the agreement.   Accordingly, the Court determines that the Government has proven every element of conspiracy to commit offenses against the United States, *i.e.*, to violate FIFRA, beyond a reasonable doubt as to both Yost and Reese.   The Court will return a guilty verdict as to both Defendants on Count One.

---

[9]      To the extent that Yost and Reese fault the Government for failing to provide evidence to reconcile the time-stamping issue (*e.g.*, a receipt from Best Buy for its repair), the dating of photographs in the record is ultimately immaterial given that Theresa Edwards's eyewitness account of events on June 22nd is corroborated by, *inter alia*, Officer Gibbs's testimony and body-camera footage wherein Yost and Reese confirmed that Reese was spreading corn in the soybean field on June 22nd.   The Court further addressed its assessment of Theresa Edwards's credibility *supra* note 4.

B.   <u>Count Two – Unlawful Use of a Registered Restricted-Use Pesticide</u>

Defendants are charged in Count Two with unlawful use of a registered restricted-use pesticide in violation of FIFRA, 7 U.S.C. §§ 136j(a)(2)(F) and 136l(b)(2).   Specifically, in Count Two the Government alleged that on June 22, 2020, Defendants, "aiding and abetting one another, did knowingly distribute, make available for use, and use the registered restricted-use pesticide carbofuran for the purpose of killing migratory birds, a purpose other than in accordance with its classification under FIFRA" in violation of 7 U.S.C. §§ 136j(a)(2)(F), 136l(b)(2), and 18 U.S.C. § 2.   (Docket No. 1, pg. 7).

*Legal Standard*

FIFRA makes it unlawful for any person "to distribute or sell, or to make available for use, or to use, any registered pesticide classified for restricted use for some or all purposes" other than as permitted by Section 136a(d) and implementing regulations.   7 U.S.C. § 136j(a)(2)(F).   Any private pesticide applicator or other person not addressed in Section 136l(b)(1) "who knowingly violates," in this case § 136j, is "guilty of a misdemeanor and shall on conviction be fined not more than $1,000, or imprisoned for not more than 30 days, or both." *Id.* § 136l(b)(2).   Accordingly, the elements of the offense are: the defendant (1) distributed or sold, or made available for use, or used, any registered pesticide classified for restricted use for some or all purposes; (2) distributed or sold, or made available for use, or used such registered restricted-use pesticide other than in accordance with 7 U.S.C. § 136a(d) and any regulations thereunder; and (3) acted knowingly. *Id.* §§ 136j(a)(2)(F), 136l(b)(2).

For the third element, that the defendant acted knowingly, an individual acts knowingly when they "act[] voluntarily and intentionally and not because of mistake or accident or other

innocent reason." *Third Circuit Model Criminal Jury Instructions*, 5.02.   FIFRA's "knowingly" scienter requirement is "used to reflect the requirement that general intent be proved in order to establish a violation."   *United States v. Corbin Farm Serv.*, 444 F. Supp. 510, 519 (E.D. Cal. 1978).   That is, to prove a violation of FIFRA under Section 136l(b)(2), the Government must prove "that the defendants knew they were dealing with a pesticide when they [applied it] or caused it to be [applied]."   *Id.* at 520.   But the Government does not have to prove that the defendant knew the conduct was unlawful.   *United States v. Hayden*, 64 F.3d 126, 130 (3d Cir. 1995).

## *Findings and Conclusions*

The Court has considered the stipulations, evidence presented at trial, and post-trial submissions with respect to Count Two as to Yost and Reese.   For the reasons explained herein, the Court has determined that the Government has proven beyond a reasonable doubt that Yost and Reese violated FIFRA by knowingly using a registered restricted-use pesticide for an unauthorized use.

For the first element of the offense, the evidence showing that Yost and Reese used carbofuran is largely the same for both defendants.   Theresa Edwards testified that on June 22nd Reese was in the soybean field and appeared to be using a shovel to spread something from the back of his UTV.   The next day, when Officer Gibbs inspected the same area, he observed a large amount of whole kernel yellow corn—more than he could collect—as well as "dead animals [(geese)] either on the corn or just off to the side of the corn."   (Tr. 184:18-23; 197:13-14 ("I couldn't collect all of the corn.   There was far too much of it.")).   The parties have stipulated that a sample of such corn was tested by PADLS and showed the presence of carbofuran.   (Docket No. 69, pg. 4).

When Officer Gibbs questioned Yost and Reese about the incident later in the day, Yost admitted that he told Reese to put out corn so that geese would stop eating the soybean crop. (Exhibit 10, pg. 2).   And Reese did not deny that he had been shoveling corn out of the back of the UTV on June 22nd.   (Tr. 210:17-19).   When Reese could not show Officer Gibbs the bag that had held the corn he spread in the soybean field, he indicated he had used it all up and that the bag had been burned.   (Ex. 10, pg. 9).   Based on this evidence, it is reasonable for the Court to infer that Reese spread the carbofuran-treated corn that Officer Gibbs found in the soybean field on June 23rd.   The evidence thus proves the first element of a FIFRA violation as to Reese beyond a reasonable doubt.   It also proves the first element of a FIFRA violation as to Yost as principal for having induced Reese to act thus, pursuant to 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.").

The second element of the alleged FIFRA violation—that a restricted-use pesticide was used other than in accordance with Section 136a(d) and any regulations thereunder—is one the Court can address efficiently.   The parties jointly stipulated that carbofuran is a registered restricted-use pesticide, and that it has had no authorized uses since 2009.   (Docket No. 69, pg. 2).   Because the Court has determined that Yost and Reese used carbofuran on June 22, 2020, the second element of Defendants' criminal liability for having violated FIFRA is proven.

For the third element of the instant offense—that Defendants acted knowingly—the Court addresses the evidence first with respect to Yost, and then with respect to Reese.   In its evaluation of a defendant's state of mind, the Court may "consider evidence about what [they] said, what [they] did and failed to do, how [they] acted, and all the other facts and circumstances shown by

the evidence that may prove what was in [their] mind[s] at that time." *Third Circuit Model Criminal Jury Instructions*, 5.01.   With respect to Yost, the Government must prove beyond a reasonable doubt that Yost knowingly induced Reese to use carbofuran-treated corn.   To that end, the Government presented evidence that attempts by Yost Farms employees to rid themselves of geese escalated throughout the month of June 2020.   Shortly before June 22nd, Yost had acquiesced to Karren Worrell's request that he remove traps from the area where geese congregated.[10]   Yost's statements to Officer Gibbs show his frustration with the geese and his intent to stop them from eating his soybean crop.   Such evidence supports an inference that Yost knowingly induced Reese to use carbofuran-treated corn to harm or kill the geese that were destroying his crop.

Not only that, but the Court also notes that Yost was a certified pesticide applicator and longtime operator of Yost Farms.   His familiarity with agrichemicals—discussed above—makes it unlikely he would have directed the use of a pesticide unknowingly.   *Cf. United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir. 1986) (finding that drug odor alone was not sufficient to permit an inference that appellant knowingly concealed a drug in a vehicle when the government did not produce direct evidence showing the appellant's familiarity with the drug).   Further bolstering this conclusion is evidence which has already been discussed by the Court that suggests a consciousness of guilt.   Though Officer Gibbs repeatedly explained to Yost that the only corn he found in the soybean field was yellow corn, Yost insisted that Reese distributed seed corn and repeatedly asked Officer Gibbs to take some of his seed corn for testing.   Such misdirection tends

---

[10]     The Court considered Yost's suggestion that his willingness to remove his traps at Karen Worrell's request suggests he would not have gone on to poison the geese affecting his crop.   The evidence supporting that inference, however, does not give rise to a reasonable doubt with respect to Yost's mental state and overall criminal culpability for a FIFRA violation.

to show that Yost knowingly induced Reese to use carbofuran-treated corn.   For this and the foregoing reasons, the Government has proven Yost's guilt as to Count Two beyond a reasonable doubt.

With respect to whether Reese acted knowingly, the Government presented as evidence that he was invested in Yost Farms' escalating measures to drive geese away from the soybean crop.   Theresa Edwards testified that it was Reese who set traps near the soybean field.   And when Officer Gibbs and Benjamin Edwards found these traps, the former noted that while it was impossible to tell whether the traps had been set for geese specifically, the traps "did seem like they were … placed where geese could walk."   (Tr. 179:1-4).   The next week, when Officer Gibbs came to Yost Farms to execute his search warrant concerning the dead migratory birds found in the soybean field, Reese confirmed that he had spread corn for the geese to eat the day prior. Reese further indicated they had burned the bag that contained that corn.   The destruction of the bag Reese used to shovel corn into the soybean field is suggestive of consciousness of guilt, as is the change in Reese's account of those facts when he was later interviewed by Ms. Driggers.   And while Reese was not a certified pesticide applicator like Yost, his occupation makes it unlikely he would have believed in good faith he was not using carbofuran-treated corn.[11]   When considered in combination, the foregoing proves beyond a reasonable doubt that Reese had a knowing state of mind when he used carbofuran-treated corn on June 22, 2020.   Accordingly, the Government has proven beyond a reasonable doubt all of the elements necessary to a guilty verdict for Reese on Count Two for having violated FIFRA.

---

[11]     The Court considered Yost's and Reese's argument that, if the Government is correct, then Reese was spreading carbofuran at his own risk—shirtless, maskless, and gloveless—and weighed this alongside other evidence relevant to a determination of whether he knowingly violated FIFRA.

C.   Count Three – Unlawful Killing of Migratory Birds

Defendants are charged in Count Three with unlawful killing of migratory birds in violation of the MBTA, 16 U.S.C. §§ 703(a) and 707(a).   Specifically, in Count Three the Government alleged that Defendants, "aiding and abetting one another, did unlawfully kill and attempt to kill migratory birds without permit or authorization, to wit: approximately seventeen (17) Canada geese, ten (10) red-winged blackbirds, and one (1) mallard duck" in violation of 16 U.S.C. §§ 703(a), 707(a), and 18 U.S.C. § 2.   (Docket No. 1, pg. 8).

*Legal Standard*

The MBTA makes it unlawful "by any means or in any manner" to kill or attempt to kill any migratory bird.   16 U.S.C. § 703(a).   Pursuant to § 707(a), any person who violates § 703(a) is guilty of a misdemeanor and "shall be fined not more than $15,000 or be imprisoned not more than six months, or both."   *Id.* § 707(a).   The elements of unlawful killing of migratory birds in violation of Section 703(a) are: (1) that the defendant by any means or in any manner, killed or attempted to kill any migratory bird; (2) that such migratory bird was listed in 50 C.F.R. § 10.13; and (3) that the defendant did not possess a permit or authorization.   16 U.S.C. §§ 703(a), 707(a); *United States v. Chevron USA, Inc.*, Crim No. 09-CR-0132, 2009 WL 3645170, at *1 (W.D. La. Oct. 30, 2009).   Killing "by any means or in any manner" includes poisoning.   *Corbin Farm*, 444 F. Supp. at 532.   For misdemeanor violations of the MBTA, there is no scienter requirement. *United States v. Engler*, 806 F.2d 425, 431 (3d Cir. 1986).

*Findings and Conclusions*

The second and third elements of the charged MBTA violation—listing of the birds on the regulatory list of birds protected by the MBTA and the absence of a permit or authorization—are

23

satisfied as to both Yost and Reese by the parties' stipulations.   (Docket No. 69, pg. 3).   That leaves only the question of whether the Government proved beyond a reasonable doubt that Yost and Reese killed or attempted to kill the birds that were found in the soybean field on June 23, 2020.   And because the parties also stipulated that PADLS concluded the three geese recovered by Officer Gibbs died of carbofuran toxicity and the whole kernel corn found in the same field and in the gizzard of a goose carcass showed the presence of carbofuran, all that remains is to ask whether Yost and Reese were responsible for the presence of that corn in the soybean field.   For many of the reasons supporting the Court's conclusions with respect to Yost's and Reese's guilt for Counts One and Two, the Court is also satisfied that the Government's presentation of evidence proves this element of the MBTA offense beyond a reasonable doubt.

With respect to Yost, the Court has repeatedly noted that Yost admitted to Officer Gibbs that he told Reese to spread corn for the geese to eat on June 22nd.   Theresa Edwards testified that she saw Reese doing just that.   Yost denied that the corn Reese spread in the soybean field was carbofuran-treated, but acknowledged to Officer Gibbs that he directed Reese to spread corn in the soybean field for the geese to eat (instead of eating the farm's young soybean plants).   That, along with the presence of carbofuran-treated corn in the soybean field, supports an inference that Yost induced Reese to put carbofuran-treated corn in the soybean field, *i.e.*, to kill or attempt to kill the migratory birds found on June 23rd in violation of 16 U.S.C. §§ 703(a), 707(a), and 18 U.S.C. § 2.

With respect to Reese, much of the same evidence shows beyond a reasonable doubt that he killed or attempted to kill migratory birds.   Regardless of whether Reese intended to kill migratory birds, he admitted to Officer Gibbs that he spread corn in the soybean field on June 22,

2020.   Reese further indicated he had used up the bag of corn he had been spreading in the soybean field and that it had been burned with other trash.   That representation is consistent with Theresa Edwards's testimony that she saw Reese in the soybean field on June 22nd shoveling what appeared to be grain out of the back of a UTV.   The very next day, the Edwardses discovered nearly thirty dead migratory birds in the soybean field in the same area as a large amount of whole kernel yellow corn that testing showed was treated with carbofuran.   From this evidence the Court reasonably infers that the carbofuran-treated corn found by Officer Gibbs in the soybean field on June 23rd was the same corn Reese spread in that field on June 22nd, *i.e.*, the corn that caused the migratory birds' deaths from carbofuran toxicity.   Accordingly, the Government has proven beyond a reasonable doubt all of the elements necessary to convict Reese of killing or attempting to kill migratory birds in violation of 16 U.S.C. §§ 703(a), 707(a).

## IV.   <u>Conclusion</u>

Based upon the foregoing findings of fact and conclusions of law, the Court finds Defendants guilty as to Count One, Count Two, and Count Three of the Information at Criminal No. 21-467.

<u>*s/ W. Scott Hardy*</u><br>
W. Scott Hardy<br>
United States District Judge

Date:         January 24, 2024

cc/ecf:      All counsel of record